# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ZODIAC SEATS US, LLC, | § | |
|     *Plaintiff*, | § | |
| | § | Civil Action No. 4:17-cv-00410 |
| v. | § | Judge Mazzant |
| | § | |
| SYNERGY AEROSPACE CORP., | § | |
|     *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On April 25, 2017, Plaintiff Zodiac Seats US LLC ("Zodiac")[1] filed a civil action against Defendant Synergy Aerospace Corporation ("Synergy") and certain other entities[2] in the 235th Judicial District Court of Cooke County, Texas (Dkt. #1-1, pg. 9). On June 9, 2017, the action was removed to this Court based on diversity of citizenship (Dkt. #1).[3] On June 16, 2017, Zodiac filed its Original Complaint asserting claims for breach of contract, quantum meruit/unjust enrichment, and attorneys' fees (Dkt. #6). The action was referred to a United States Magistrate Judge for pretrial purposes.

On January 30, 2019, pursuant to 28 U.S.C. § 636 and the consent of the parties (Dkt. #66), the Court referred the following issues to the Magistrate Judge for consideration and final disposition: (1) the applicability of the United Nations Convention on Contracts for the International Sale of Goods (the "CISG") to this case; and (2) whether the CISG bars the prevailing party's ability to recover attorneys' fees (Dkt. #67). On April 23, 2019, the Magistrate Judge

---

[1] On December 1, 2018, Zodiac changed its name to Safran Seats USA LLC. At certain times during trial, as well as in its proposed findings of fact and conclusions of law, Plaintiff refers to itself as "ZSUS." For convenience purposes, however, in this Order the Court will refer to Plaintiff as "Zodiac."

[2] The other parties have since been dismissed from the civil action, leaving only Synergy as a Defendant.

[3] For further discussion of the jurisdictional basis for this action, see *infra* CONCLUSIONS OF LAW, ¶1 & n.6.

ordered that CISG controlled the parties' dispute and did not bar the prevailing party's ability to recover attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code (Dkt. #80).

The Magistrate Judge also issued a Report and Recommendation on the parties' summary judgment motions on February 5, 2019 (Dkt. #69). The Report and Recommendation recommended, in relevant part, that the Court grant summary judgment as to (1) Zodiac's quantum meruit/unjust enrichment claim, and (2) Synergy's counterclaim for breach of the implied warranty of fitness for a particular purpose (Dkt. #69). On February 19, 2019, Zodiac filed limited objections to the part of the Magistrate Judge's Report and Recommendation that recommended denial of its motion for partial summary judgment on Synergy's express warranty and implied warranty of merchantability counterclaims (Dkt. #74).

On March 15, 2019, the Court adopted the findings and conclusions of the Magistrate Judge as the findings and conclusions of the Court and overruled Zodiac's limited objections (Dkt. #79). Accordingly, the claims that remain for disposition are as follows: (1) Zodiac's claims for breach of contract and attorneys' fees; and (2) Synergy's counterclaims for breach of contract, breach of express warranty and the implied warranty of merchantability, and attorneys' fees.

On November 5–6, 2019, the Court held a bench trial in the above-styled matter. After consideration of the parties' arguments and of the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any of the findings of fact constitute conclusions of law, or any of the conclusions of law constitute findings of fact, they are adopted as such.

# FINDINGS OF FACT

Having carefully reviewed the evidence and arguments presented at trial, the Court finds the following facts by a preponderance of the evidence.

## *The Parties*

1.     Zodiac is a limited liability company whose sole member, Zodiac US Corporation, is organized under the laws of the State of Delaware and has its principal place of business in Delaware.  (1RR13:11-15.) [4]  Therefore, Zodiac is a citizen of Delaware.  *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008); 28 U.S.C. § 1332(c)(1).

2.     Synergy is a corporation organized under the laws of the Republic of Panama and has its principal place of business in Brazil.  (Dkt. #1).  Therefore, Synergy is a citizen of Panama and Brazil.  *See* 28 U.S.C. § 1332(c)(1).

3.     Zodiac is a manufacturer of commercial airline seats.  (1RR13:19-21.)  Synergy is a South American conglomerate that offers air travel services through affiliated entities.  (Dkt. #57, Joint Stip. ¶¶1-2.)

4.     Synergy is the largest controlling shareholder of Oceanair, which does business as Avianca Brazil and provides air transport services, including passenger service.  Synergy is also the largest controlling shareholder of Avianca, which, among other things, holds investments in passenger airlines.  (*Id.*, Joint Stip. ¶3; 1RR211:11-15.)

## *Relevant Background*

5.     Synergy contracted with aircraft manufacturer Airbus to purchase six A-330 commercial aircraft bearing manufacturer's serial numbers ("MSN") 1492, 1508, 1540, 1586,

---

[4] Citations to the trial transcript from the first day of trial, November 5, 2019, are in the form "1RR[page]:[line(s)]." Citations to the trial transcript from the second day of trial, November 6, 2019, are in the form "2RR[page]:[line(s)]." Moreover, Plaintiff's exhibits are designated "PX[#]" and Defendant's exhibits are designated "DX[#]."

1608, and 1657. (1RR21:11-14.) The parties refer to this as Synergy's "A-330 Program." (Dkt. #57, Joint Stip. ¶5; *see* 1RR17:5-11.) These aircraft did not contain certain aircraft interior components, such as seats. (1RR17:5-11.) In connection with the A-330 Program, Synergy contracted with Zodiac, among various suppliers, to acquire buyer furnished equipment, which is equipment supplied by third parties for installation into the Airbus aircraft. (*Id.*, Joint Stip. ¶6). Buyer furnished equipment with respect to a supplier, such as Zodiac, includes material or parts that a customer selects and purchases from a third party, such as inflight entertainment systems, seatbelts, leather, and fabric used to manufacture seats. (1RR22:4-7.) Buyer furnished equipment with respect to an airframe manufacturer, such as Airbus, includes seats from Zodiac, galleys, and lavatories. (1RR22:8-21.) Synergy contracted with Zodiac to acquire tourist class and business class seats for the A-330 Program. (*Id.*, Joint Stip. ¶7).

6.      The terms of the agreement between Synergy and Zodiac for the A-330 Program were set forth in proposals with terms and conditions, purchase orders, purchase order acknowledgments, invoices, and other forms of written correspondence—primarily emails. (Dkt. #57, Joint Stip. ¶9; PX016; 1RR23:3-19; 2RR30:23 to 31:15.)

7.      The terms and conditions for the tourist class and business class seats for the A-330 Program are set forth in the A330 5751 Proposal for tourist class seats (the "Tourist Class Proposal") and the A330 Cirrus Proposal for business class seats (the "Business Class Proposal") (collectively, the "Proposals"). (Dkt. No. 57, Joint Stip. ¶¶10-11; PX042-43; 1RR23:20 to 24:9; 1RR29:18-24.) Under the Proposals, the payment terms are net 45 days. (PX042, Ex. A-3 #23; PX043, Ex. A-3 #11; 1RR28:22 to 29:1; 1RR30:15-18.)

8.      Synergy contracted with Zodiac to purchase fully customized tourist class and business class seats for the A-330 Program. (Dkt. #57, Joint Stip. ¶7; 1RR17:12 to 18:5.) Other

suppliers of buyer furnished equipment for the A-330 Program included Panasonic, which provided inflight entertainment systems to be installed in the seats manufactured by Zodiac, and Honeywell, Inc., which supplied certain electronic components for the A-330 aircraft. (*E.g.*, PX007-08; PX057; PX058; 1RR25:8 to 26:1.) Zodiac needed to receive the inflight entertainment systems from suppliers such as Panasonic before it could start assembly of the seats Synergy ordered, so a delay in Zodiac's receipt of the inflight entertainment systems would affect the entire production schedule. (1RR26:7 to 28:12.)

9. The A-330 Program was not the only project that Zodiac was working on for Synergy or other Synergy-related airlines. (1RR19:6-10.) Zodiac was simultaneously working on a Boeing 787 Program for Avianca that involved seats that were virtually identical to the seats Zodiac was manufacturing for the A-330 Program. (1RR20:1-10; Carvajal Depo. 16:3-14.) Zodiac was also working on an Airbus A-320 Program for Synergy. (1RR19:23-25.)

10. Under the Proposals, Zodiac agreed that if timely delivery, determined in conjunction with Airbus's production schedule, was not made, Zodiac would pay, after a 5-day grace period, a late delivery penalty equal to 1.0% of any given shipset value per day (up to a max of 20%). (PX042, p. 4, PX043, p. 4.) A complete floorplan of seats for the tourist class section and business class section of an aircraft is known as a "shipset." (1RR16:2-8.) The A-330 Program involved six shipsets—one shipset for each of the six A-330 aircraft bearing MSN 1492, 1508, 1540, 1586, 1608, and 1657. (Dkt. #57, Joint Stip. ¶8; 1RR17:5-11.) The penalty provision applied to all of the A-330 Shipsets (PX042; PX043; 1RR102:11 to 103:17). It is undisputed that Zodiac has never paid or otherwise credited an amount to Synergy under the Proposals' penalty provision.

11.    Synergy issued separate purchase orders to Zodiac for tourist class and business class seats to be installed in the A-330 aircraft MSN 1492 ("Shipset 1").  Synergy issued Purchase Order No. 4 ("P.O.4") for tourist class seats in Shipset 1 and Purchase Order No. 8 ("P.O.8") for business class seats in Shipset 1.  (PX001; PX044.)  After Synergy revised P.O.4 to correct shipping terms, Zodiac acknowledged receipt and acceptance of revised P.O.4 in a Purchase Order Acknowledgement.  (PX045.)  Zodiac also acknowledged receipt and acceptance of P.O.8 in a Purchase Order Acknowledgement.  (PX162.)

12.    Under the accepted purchase orders for Shipset 1, the agreed-upon price of the tourist class seats was $1,056,458 and the agreed-upon price of the business class seats was $2,891,358.  (1RR32:7-25.)  Therefore, the total agreed-upon price of Shipset 1 was $3,947,816.  (Dkt. #57, Joint Stip. ¶17.)  Zodiac invoiced Synergy for Shipset 1 by sending Invoice Nos. 194613, 194614, 194615, 194762, 194673, 194881, 228000, 228001, 228002, 228003, and 228004 (the "Shipset 1 Invoices").  (PX199; 1RR33:3-14.)  Synergy has not paid the Shipset 1 Invoices in full. (1RR33:15-17.)  Whether Synergy is entitled to withhold any of the amounts stated in the Shipset 1 Invoices is disputed.

13.    Synergy also issued separate purchase orders to Zodiac for tourist class and business class seats to be installed in the A-330 aircraft MSN 1508 ("Shipset 2").  Synergy issued Purchase Order No. 46 ("P.O.46") for tourist class seats in Shipset 2 and Purchase Order No. 47 ("P.O.47") for business class seats in Shipset 2.  (PX045-46.)  After Synergy revised P.O.46 to correct shipping terms, Zodiac acknowledged receipt and acceptance of revised P.O.46 in a Purchase Order Acknowledgement.  (PX045.)  Zodiac also acknowledged receipt and acceptance of P.O.47 in a Purchase Order Acknowledgement.  (PX046; 1RR33:18 to 34:22.)

14.     Under the accepted purchase orders for Shipset 2, the agreed-upon price of the tourist class seats was $1,056,458 and the agreed-upon price of the business class seats was $2,891,358. (1RR34:1-4; 1RR34:17-19.) Therefore, the total agreed-upon price of Shipset 2 was $3,947,816. (Dkt. #57, Joint Stip. ¶25.) Zodiac invoiced Synergy for Shipset 2 by sending Invoice Nos. 194505, 194616, 194617, 194618, 227999, and 228069 (the "Shipset 2 Invoices"). (PX199; 1RR33:3-14.) Synergy has not paid the Shipset 2 Invoices in full. (1RR34:23-25.) Whether Synergy is entitled to withhold any of the amounts stated in the Shipset 2 Invoices is disputed.

15.     Synergy issued Purchase Order No. 121 and Purchase Order No. 122 for tourist class and business class seats to be installed in the A-330 aircraft MSN 1540 ("Shipset 3"). The total agreed-upon price of Shipset 3 was $3,947,816, and the parties agree Zodiac has been paid for Shipset 3. (Dkt. #57, Joint Stip. ¶31; 1RR35:11-13.)

16.     Synergy issued Purchase Order No. 178 and Purchase Order No. 179 for tourist class and business class seats to be installed in the A-330 aircraft MSN 1586 ("Shipset 4"). The total agreed-upon price of Shipset 4 was $3,947,816, and the parties agree Zodiac has been paid for Shipset 4. (Dkt. #57, Joint Stip. ¶32; 1RR35:11-13.)

17.     Synergy issued Purchase Order No. 232 and Purchase Order No. 233 for tourist class and business class seats to be installed in the A-330 aircraft MSN 1608 ("Shipset 5"). The total agreed-upon price of Shipset 5 was $3,947,816, and the parties agree Zodiac has been paid for Shipset 5. (Dkt. #57, Joint Stip. ¶33; 1RR35:11-13.)

18.     Synergy issued Purchase Order No. 276 and Purchase Order No. 278 for tourist class and business class seats to be installed in the A-330 aircraft MSN 1657 ("Shipset 6"). The total agreed-upon price of Shipset 6 was $4,028,756, and the parties agree Zodiac has been paid for Shipset 6. (Dkt. #57, Joint Stip. ¶34; 1RR35:11-13.)

19.     The A-330 Program involved certain non-recurring expenses for development and engineering services, among other things.  (Dkt. #57, Joint Stip. ¶36; 1RR24:13-21.)  Synergy issued Purchase Order No. 5 ("P.O.5"), Purchase Order No. 6 ("P.O.6"), Purchase Order No. 78 ("P.O.78"), Purchase Order No. 148 ("P.O.148"), and Purchase Order No. 149 ("P.O.149") for non-recurring expenses.  (Dkt. No. 57, Joint Stip. ¶37; PX047-49; 1RR35:14-19.)  Zodiac acknowledged receipt and acceptance of these non-recurring expenses purchase orders by providing Purchase Order Acknowledgements.  (Dkt. No. 57, Joint Stip. ¶39.)

20.     The total agreed-upon price of non-recurring expenses, covered by P.O.78, P.O.148, and P.O.149, is $2,200,406.50, and this amount was invoiced by Zodiac pursuant to Invoice Nos. 191732, 191733, 198527, 205838, 205839, and 205840 (the "Non-recurring Expenses Invoices").  (PX199; 1RR33:3-14.)  Synergy has not paid the Non-recurring Expenses Invoices in full. Whether Synergy is entitled to withhold any of the amounts stated in the Non-recurring Expenses Invoices is disputed.

21.     Under the Proposals, Synergy was responsible for all freight charges in connection with the A-330 Program unless Zodiac agreed otherwise.  (PX042, Ex. A-3 #7; PX043, Ex. A-3 #3.)  Zodiac never agreed to cover freight charges for the A-330 Program, and Zodiac incurred freight charges of $55,170 in connection with shipping seats for the A-330 Program.  (*E.g.*, Dkt. #57, Joint Stip. ¶¶41-42; 1RR28:13-21; 1RR30:5-14; 2RR37:7-10.)  Zodiac invoiced Synergy for the freight charges by sending Invoice Nos. 198624, 198625, and 249429 (the "Freight Invoices").  (PX199; 1RR33:3-14.)  Synergy has not paid the Freight Invoices.  (1RR35:20 to 36:36.)  Whether Synergy is entitled to withhold any of the amounts stated in the Freight Invoices is disputed.

22. Under the purchase orders issued by Synergy, which were acknowledged and fulfilled by Zodiac, the total amount due to Zodiac for the A-330 Program is $28,085,021.00. (Dkt. #57, p. 7.) The following table reflects the itemized amounts due Zodiac under the parties' agreement.

| Item | Amount Due |
|---|---|
| Shipset 1 (for A-330 aircraft MSN 1492) | $3,947,816.00 |
| Shipset 2 (for A-330 aircraft MSN 1508) | $3,947,816.00 |
| Shipset 3 (for A-330 aircraft MSN 1540) | $3,947,816.00 |
| Shipset 4 (for A-330 aircraft MSN 1586) | $3,947,816.00 |
| Shipset 5 (for A-330 aircraft MSN 1608 | $3,947,816.00 |
| Shipset 6 (for A-330 aircraft MSN 1657 | $4,028,756.00 |
| NRE for the A-330 Program | $4,262,015.00 |
| Freight Charges | $55,170.00 |
| **TOTAL** | **$28,085,021** |

23. Synergy has paid Zodiac a total of $23,028,971.54 for the A-330 Program. (Dkt. #57, p. 8.). The following table reflects the itemized amounts paid by Synergy to Zodiac under the parties' agreement.

| Date of Payment | Designation of Payment | Amount |
|---|---|---|
| August 30, 2013 | Non-recurring expenses | $500,000.00 |
| August 30, 2013 | Non-recurring expenses | $500,000.00 |
| August 30, 2013 | Non-recurring expenses | $500,000.00 |
| August 30, 2013 | Non-recurring expenses | $500,000.00 |

| August 30, 2013 | Non-recurring expenses | $61,608.50 |
|---|---|---|
| December 31, 2014 | MSN 1540 and 1586 (Shipsets 3 and 4) | $8,968,115.40 |
| December 4, 2015 | MSN 1608 (Shipset 5) | $4,484,058.00 |
| December 4, 2015 | MSN 1608 (Shipset 5) | $1,515,565.82 |
| December 4, 2015 | MSN 1657 (Shipset 6) | $1,515,565.82 |
| December 4, 2015 | MSN 1657 (Shipset 6) | $4,484,058.00 |
| **TOTAL** | | **$23,028,971.54** |

24.    Thus, the total unpaid amount under the parties' agreement is $5,056,049.46.

*The Dispute*

25.    During the early stages of Zodiac's work on the A-330 Program, Zodiac did not receive timely payment from Synergy for non-recurring expenses. (1RR36:20 to 37:3.)  This prompted Zodiac's then President Jeffrey Johnston to send a letter to Adolfo Carvajal, who is the Avianca chief engineer who oversaw technical specifications for the seats ordered by Synergy. (PX002; 1RR37:16 to 38:1.)  Mr. Johnston stated that Zodiac had not received payment for the non-recurring expenses invoiced in March and April of 2013.  (*Id.*)  Mr. Johnston further stated that Zodiac was willing to work with Synergy to extend the payment terms for the non-recurring expenses, but Zodiac needed to receive at least $2,061,608.50—i.e., the amount due for non-recurring expenses under P.O.5 and P.O.6—by August 31, 2013.  (*Id.*)

26.    On August 30, 2013, Zodiac received payment of $2,061,608.50 from Synergy. (PX197; 1RR37:10-12.)  The parties agree this payment satisfies Synergy's obligation to Zodiac with respect to P.O.5 and P.O.6. (PX197.)

27.     Through various technical meetings and exchanges, including but not limited to an initial technical meeting, a preliminary design review, a critical design review, and First Article Inspection, Zodiac represented, and Synergy agreed to, various aspects of the form and function of the seats Zodiac would provide.  (1RR103:18 to 108:11.)

28.     On November 8, 2013, Zodiac's program manager sent a letter to Synergy, informing Synergy that unforeseen issues would result in a delay of the initial shipset of A-330 seats.  (DX009.)  Zodiac's delay notice advised that Zodiac had rescheduled the First Article Inspection to January 13, 2014 and set the expected delivery date of the initial shipset of A-330 business class seats to January 29, 2014.  The notice referred Synergy to the delay remedies set forth in Exhibit A-3 to the Proposals.  (*Id.*)

29.     On January 14, 2014, Synergy responded to Zodiac's November 8, 2013 delay notice, informing that the delay would result in direct damages to Synergy.  Synergy's Raul Campos informed Zodiac that in addition to the late delivery penalty provided in Zodiac's proposals, Synergy was requesting direct damages incurred including but not limited to: (i) leases related to the financing of the aircraft; (ii) interests related to any pre-delivery payment facilities; and (iii) penalties imposed by Airbus as a result of the delays.  (DX016; *see also* 1RR108:16 to 109:14).

30.     During the First Article Inspection, Synergy identified certain issues with the aircraft seats that it deemed unsatisfactory.  (1RR39:21 to 40:1.)  The issues that Synergy deemed unsatisfactory were referred to by the parties as "pickup items" and/or "quality issues."  (1RR40:2-17; 1RR48:4-7.)  Such issues are commonplace and consist mainly of cosmetic issues that do not affect the certification or functionality of the seats.  (1RR40:2-14; 1RR41:4-6; 1RR48:16 to 50:22.)  Pickup items could include issues that arose during the installation process by Airbus or even later

as the seats entered commercial use, but no pickup item could involve anything that would affect the safety of the seats.  (1RR40:23 to 41:31; 1RR46:9 to 47:24.)

31.    Despite the pickup items identified, Synergy agreed that Zodiac should continue to manufacture and deliver the seats to Airbus with the understanding that the parties would work to resolve the pickup items through the provision of no-charge parts, modification kits, and/or other measures after Airbus delivered the aircraft to Synergy.  (1RR41:7 to 44:15.)

32.    Zodiac documented the various issues and nonconformities in written Commitment Letters for Shipset 1 and Shipset 2, respectively.  (PX059 (the "Shipset 1 Commitment Letter"); PX060 (the "Shipset 2 Commitment Letter")).  The parties refer to the Shipset 1 Commitment Letter and Shipset 2 Commitment Letter collectively as the "Commitment Letters."  These Commitment Letters serve as a means for Zodiac to document and track nonconformities and other issues that did not meet Synergy's expectations.

33.    Commitment letters are common in the industry to address, among other things, pickup items and/or quality issues and do not affect a buyer's obligation to make payment for seats it receives.  (1RR42:5-7; 1RR44:16-21; 2RR24:12-15.)  Indeed, it is widely known and accepted within the industry that a buyer must still pay for seats that are delivered even if commitment letter items remain unresolved at the time.  (1RR45:2-8.)  This reflects the fact that commitment letter items do not affect the functionality, performance, or safety of the seats and thus do not prevent their use in commercial operations.  (1RR51:4-10.)

34.    For quality issues that would be resolved through the provision of new or replacement parts, a no charge purchase order was required before Zodiac could ship the parts.  (1RR51:21–52:12.)  The no charge purchase orders were needed to meet traceability standards in the industry, so Zodiac could not ship a part unless it received the correct no charge purchase order

from Synergy. (1RR52:2-13.) Zodiac communicated this in the Commitment Letters. (PX59, 60). Nevertheless, there were instances in which Synergy did not submit a no charge purchase order or delayed sending a correct no charge purchase order, and this necessarily delayed the resolution of the issue the Commitment Letter was intended to address. (*E.g.*, PX103; 1RR53:11 to 54:14.)

35. As Zodiac continued its work manufacturing shipsets for the A-330 Program, Zodiac issued a series of Program Change Advisories to inform Synergy and Airbus of issues that could affect delivery, engineering, or other aspects of the program. (Dkt. #57, Joint Stip. ¶46; 1RR54:19-22.)

36. On April 4, 2014, Zodiac issued Program Change Advisory No. 1584 to Synergy and copied Airbus, stating that Synergy's accounts with Zodiac were "in serious danger of being put on credit hold because of past due invoices reflected [in the Program Change Advisory] totaling over $8.4M." (PX051; 1RR55:6-24.). A "credit hold" refers to a hold that is placed on a customer's account because of nonpayment, resulting in Zodiac stopping all work on the customer's projects until the credit hold is lifted. (1RR56:3-11.) A credit hold can delay the manufacture and delivery of seats not only by a period equivalent to the duration of the credit hold, but also by a longer period because of associated delays in the receipt of buyer furnished equipment that was not timely ordered during the credit hold and because a spot in the production schedule at Zodiac is not necessarily immediately available when the credit hold is lifted. (1RR56:9 to 57:12.) These facts are well known in the airline industry. (1RR58:3-7; 2RR29:1-21.)

37. Program Change Advisory No. 1584 included a notation that a credit hold for the A-330 Program could have an effect on delivery and engineering. (PX051.) Program Change Advisory No. 1584 also included a notation that cables from Panasonic for the inflight

entertainment systems were needed to avoid disruptions in the manufacture of the seats. (*Id.*) Zodiac needed the components from Panasonic before it could begin production of the seats for A-330 shipsets, so a delay in Zodiac's receipt of buyer furnished equipment from Panasonic would result in a delay of the manufacturing and delivery of the seats by Zodiac. (1RR58:8 to 59:9.)

38.     On April 16, 2014, Zodiac issued Program Change Advisory No. 1591 to Synergy and copied Airbus, stating that Synergy's accounts with Zodiac were "subject to being put on credit hold due to the substantial delinquent invoices exceeding $10.4 Million as listed [in the Program Change Advisory]." (PX052.) Program Change Advisory No. 1591 included a notation that a credit hold could affect delivery for the entire A-330 Program. (*Id.*; 1RR60:20 to 61:15.) Program Change Advisory No. 1591 also included a "RED" status warning, signaling to Synergy that the Program Change Advisory was a serious warning that if the requested action was not taken (i.e., if Synergy did not resolve the delinquent payments), then Zodiac would put a credit hold in place. (1RR60:4-10.)

39.     On May 7, 2014, Zodiac issued Program Change Advisory No. 1598 to Synergy and copied Airbus, stating that Synergy's accounts with Zodiac were "suspended due to the substantial delinquent invoices exceeding $10.4 Million as listed [in the Program Change Advisory]." (PX005.) Program Change Advisory No. 1598 also stated that Zodiac had "coordinated with Airbus to hold aircraft delivery until these accounts are brought current." (*Id.*) And Program Change Advisory No. 1598 included a notation that the credit hold could have an effect on delivery, non-recurring, and engineering. (*Id.*)

40.     On June 25, 2014, Zodiac issued Program Change Advisory No. 1613 to Synergy and copied Airbus, reiterating that Synergy's accounts were still on credit hold "due to substantial delinquent invoices exceeding $17 Million U.S. dollars." (PX053.) Program Change Advisory

No. 1613 stated that "all current orders within [Zodiac's] system are on hold pending account resolution." (*Id.*) And Program Change Advisory No. 1613 included a notation that the credit hold could have an effect on delivery, non-recurring, and engineering. (*Id.*)

41. On September 8, 2014, Zodiac issued Program Change Advisory No. 1641, informing Synergy about "[d]elinquent [buyer furnished equipment] for MSN 1608 from Panasonic." (PX007.) Zodiac explained that Panasonic had informed Zodiac that the inflight entertainment system for MSN 1608 (i.e., Shipset 5) would not be shipped to Zodiac "until [c]ommercial issues are resolved between Panasonic and Synergy" and this would "delay the start of seat build for MSN 1608 until 75 days after the inflight entertainment system is received at Zodiac." (*Id.*; 1RR63:13 to 64:24; *see* Efromovich Depo. 70:2 to 71:13.)

42. On November 14, 2014, Zodiac issued Program Change Advisory No. 1670 to Synergy and copied Airbus, stating that "we have stopped the manufacture of [Shipset 5] MSN 1608 for Oceanair A330 linefit" because of "non-payment of outstanding invoices." (PX012.) PCA No. 1670 included a notation that these actions could have an effect on delivery. (*Id.*)

43. Despite the issuance of the Program Change Advisories, Zodiac delivered the seats for Shipsets 3 and 4, and aircraft MSN 1540 and 1586 were delivered on December 31, 2014. (Dkt. No. 57, Joint Stip. ¶52; PX014). Upon this delivery, Zodiac received a payment of $8,968,115.40. This payment was more than the invoiced amount for Shipsets 3 and 4, but less than the total amount Synergy owed to Zodiac under the purchase orders and corresponding invoices for the A-330 Program.

44. The credit hold that Zodiac first put in place in May 2014 remained in place until February 2015 when the parties reached an agreement. This agreement provided that Synergy would pay the full amount due for non-recurring expenses as follows: 25% when the fifth aircraft

in the A-330 Program was delivered to Synergy by Airbus; 25% when the sixth aircraft in the A-330 Program was delivered to Synergy by Airbus; and the remaining 50% once Zodiac resolved the outstanding Commitment Letter issues. (PX016). This agreement concerning the payment for non-recurring expenses is referred to as the "Non-Recurring Expenses Agreement."

45. After the parties reached the Non-Recurring Expenses Agreement, Zodiac issued Program Change Advisory No. 1697 on February 12, 2015, which stated that Synergy's accounts with Zodiac were "no longer on credit hold." (PX017). Consistent with the Non-Recurring Expenses Agreement, Program Change Advisory No. 1697 further stated that the outstanding balance due for non-recurring expenses in connection with the A-330 Program would be paid by Synergy "1/4 each with [Shipset 4] and [Shipset 5] (tagged on to the [shipset] invoice price) and the remaining 1/2 upon [Zodiac] completing" the items listed in the Commitment Letters. (*Id*).

46. By the time Zodiac lifted the credit hold in February 2015, delays in manufacturing and delivering shipsets for the A-330 Program had already occurred, but Zodiac made efforts to minimize the effect of those delays by working the shipsets back into the production schedule as quickly as was feasible. (E.g., 1RR74:5 to 75:2; 1RR76:3-17).

47. As a result, production delays continued for Zodiac throughout the summer of 2015.

48. Due to still outstanding invoices, Zodiac again placed Synergy on a credit hold in mid-September 2015, refusing further shipment of seats, delivery of parts, and work on the outstanding quality issues. Specifically, Zodiac issued Program Change Advisory No. 1760 (as revised) to Synergy and copied Airbus, explaining that Synergy had "substantial delinquent invoices exceeding $17.4 Million over 30 days and total due exceeding $20 Million as listed [in the Program Change Advisory]." (PX021.) Program Change Advisory No. 1760 "advised that

[Zodiac] will hold shipments until the Synergy account is brought current" and included a notation that this credit hold—like the earlier credit holds—could have an effect on delivery. (*Id.*)

49. Following some confusion regarding Zodiac's imposition of the September 2015 credit hold, executives for Zodiac and Synergy exchanged correspondence, and by mid-October 2015, Zodiac released the credit hold on shipments for the A-330 Program. (1RR203:21 to 204:13.)

50. Due to late delivery of buyer furnished equipment to Airbus, Airbus imposed various delay-related charges on Synergy totaling $3,297,454.00. (Joint Final Pretrial Order, p. 10.) The following table reflects the itemized amounts of charges imposed by Airbus on Synergy.

| Charge by Airbus | Amount |
|---|---|
| Additional costs on MSN 1492 | $1,225,950.00 |
| Additional costs on MSN 1508 | 236,400.00 |
| Additional costs on MSN 1540 | $150,000.00 |
| Additional costs on MSN 1586 | $150,000.00 |
| Additional costs on MSN 1608 | $300,000.00 |
| Additional costs on MSN 1657 | $225,000.00 |
| Price Escalation for MSN 1608 | $505,052.00 |
| Price Escalation for MSN 1657 | $505,052.00 |
| **TOTAL** | **$3,297,454.00** |

51. Airbus explained that the delay-related charges and price escalations were due to late deliveries of buyer furnished equipment. But the evidence was unclear regarding who specifically was to blame for the late deliveries of buyer furnished equipment. Airbus

correspondence with Synergy indicated that delay in the receipt of "some [buyer furnished equipment]" impacted the manufacturing and delivery of certain aircraft and may result in additional cost to Synergy. (*See, e.g.*, DX094.) But the Airbus documents do not explicitly single out Zodiac as the buyer furnished equipment supplier responsible for the late buyer furnished equipment that resulted in the delay related charges to Synergy. And indeed, there were other buyer furnished equipment suppliers, including Panasonic and Honeywell, that had Synergy on credit holds during certain periods in 2014. Those suppliers, as well as Zodiac, delayed shipments of buyer furnished equipment at certain times as a result of those credit holds, and the evidence is insufficient to indicate that Zodiac alone was responsible for the delay charges and price escalations imposed on Synergy.

52. Moreover, there is no indication that the credit hold Zodiac placed on Synergy's account from mid-September to mid-October 2015 had any material effect on delay-related charges imposed by Airbus on Synergy. Rather, the evidence showed that by the time the September 2015 credit hold was put in place, Zodiac's production and delivery schedules for the A-330 shipsets had already been delayed. And these earlier stoppages and delays in the manufacturing and delivery of shipsets for the A-330 Program while the initial credit hold was in place were caused by Synergy's initial failure to render timely payment to Zodiac (*E.g.*, PX005; PX012; PX051-53; 1RR74:5 to 75:2; 1RR76:3-17.) Indeed, per the Program Change Advisories issued throughout 2014, production delays existed due to unpaid amounts by Synergy well before the delivery of Shipsets 3 and 4 in December 2014.

53. On December 4, 2015, Zodiac received payments on behalf of Synergy for the A-330 Program totaling $11,999,247.64. (Dkt. #57, Joint Stip. ¶57; PX198; 1RR78:1-5.) It is undisputed that, taken together, the December 31, 2014 payment of $8,968,115.40 and the

December 4, 2015 payment of $11,999,247.64 satisfy Synergy's obligations to Zodiac with respect to Shipset 3, Shipset 4, Shipset 5, and Shipset 6 for the A-330 Program. (*Id.*, Joint Stip. ¶58.) It is also undisputed that under the purchase orders and corresponding invoices, the remaining unpaid balance for the A-330 Program is $5,056,049.46. (*Id.*, Joint Stip. ¶61.)

54.     The $5,056,049.46 total outstanding balance Zodiac alleges Synergy owes breaks down as follows: (i) $2,200,406.50 for total unpaid non-recurring expenses; (ii) $2,800,472.96 for unpaid amounts due on Shipsets 1 and 2[5]; and (iii) $55,170 in freight charges.

55.     Then, from the total outstanding balance of $5,056,049.46, Zodiac and Synergy have agreed to a deduction of $1,462,350.00. (*Id.*, Joint Stip. ¶62.) The Court will refer to this as the "Delay Agreement." The deduction of $1,462,350 under the Delay Agreement is equal to the delay-related charges imposed by Airbus on Synergy for Shipsets 1 and 2. (*See e.g.*, PX054.) The amount still in dispute between the parties is thus $3,593,699.46. (Dkt. #57, Joint Stip. ¶63.)

56.     The dispute over the remaining $3,593,699.46 centers primarily on whether Synergy is entitled to withhold (i) $1,835,104.00 in delay-related charges charged to it by Airbus for late delivery of Shipsets 3–6; (ii) $55,170.00 in freight charges; and (iii) $1,100,203.25—50% of non-recurring expenses—related to certain unresolved items from the Commitment Letters. (*See, e.g.*, PX054.)

57.     As to the unresolved Commitment Letter items, Zodiac agreed to resolve certain unsatisfactory conditions of the shipsets through the provision of no-charge parts, modification kits, or other measures. (PX059-60; 1RR45:9 to 48:15.) Whether Zodiac is entitled to receive the remaining 50% of non-recurring expenses pursuant to the Non-recurring Expenses Agreement depends on whether Zodiac completed all the outstanding Commitment Letter items.

---

[5] Synergy has not paid directly any of the $7,895,632.00 balance charged for Shipsets 1 and 2. However, it overpaid for Shipsets 3 and 4 by $5,095,159.04, effectively leaving $2,800,472.96 still outstanding for Shipsets 1 and 2.

58.     Some items listed in the Commitment Letters have been resolved.  (*E.g.*, PX039; PX061; DX048; 1RR48:16 to 53:10; Carvajal Depo. 49:5 to 50:25.)  In addition, the same items identified in the Commitment Letters for the A-330 Program existed for the seats that were part of the Boeing 787 Program for Avianca (because the seats for each program were essentially the same), and Zodiac has resolved the items as to the 787 seats.  (1RR20:1-10; 1RR77:10-21; 1RR79:18-21; 1RR81:2-7.)   But per Zodiac's own admission, some of the items in the Commitment Letters for the A-330 Program remain unresolved, despite Zodiac claiming to have solutions available for all the items.  (1RR80:11-13.)

59.     The evidence, including testimony by Zodiac employee Carlos Guzman, establishes that Zodiac was and remained ready, willing, and able to resolve the remaining issues from the Commitment Letters, but Synergy failed or refused to both (i) respond to numerous inquiries by Zodiac asking for Synergy to identify a point of contact with whom Zodiac could work to fully resolve or "close out" the Commitment Letter items, and (ii) cooperate with Zodiac by responding to repeated requests for approval of proposed solutions and coordinating with Zodiac to implement the solutions.  (*E.g.*, 1RR79:22-25; 1RR80:11-25; see Carvajal Depo. 26:11-18.)

60.     Mr. Guzman reached out to his points of contact at Synergy in May 2016, and the stated purpose of his e-mail was "to request information about who are the main contacts to resolve" the items that are still unresolved from the Commitment Letters.  (PX028.)  He explained that Zodiac had "completed about 19 critical design changes that have been incorporated" into other shipsets, and he asked for Synergy to identify the individual(s) with whom he could "establish recurrent communication to address [the A-330 Program shipsets]."  (*Id.*)  Mr. Guzman

needed Synergy to identify the person(s) he should work with in order to proceed with resolution of the Commitment Letter items. (1RR81:17 to 83:11.)

61. Mr. Guzman did not receive a response to his May 2016 e-mail, and he sent a follow up e-mail on June 7, 2016, once again "looking for POC information to address A330s open items." (PX029; 1RR83:12-14; 1RR84:5-8.) Mr. Guzman testified that "POC" means "point of contact." (1RR83:23-24.) Mr. Guzman still did not receive a response from Synergy, so he sent another e-mail to Synergy representatives on June 9, 2016. (PX061; 1RR84:9-18.) Mr. Guzman explained that "20 out of 25 Committed Design Changes have been incorporated" into shipsets for the related Boeing 787 Program, and he asked for Synergy's "help to provide me with the contact information of the person(s) from who I can reach to coordinate" the actions needed to resolve the Commitment Letter items for the A-330 Program. (PX061.) The evidence establishes that there was no reason the changes that were made and approved to resolve the items as to the seats for the Boeing 787 aircraft could not also be used to resolve the issues that remained for the A-330 Program. (*E.g.*, 1RR85:21 to 86:2; 1RR88:4 to 91:4; 2RR28:12-21.) Zodiac merely needed the approvals from Synergy—yet there was no response to Mr. Guzman's e-mail. (1RR86:3-25.)

62. In July 2016, representatives of Zodiac (including Mr. Guzman) met in Bogota, Colombia, with representatives of Synergy (including Mr. Welch and Adolfo Carvajal) to discuss issues related to the A-330 Program. (1RR14-19.) During that in-person meeting, Mr. Guzman again raised the issue about who the point of contact was for Synergy regarding resolution of the Commitment Letter items. (1RR91:20 to 92:7.) Mr. Guzman was informed that Mr. Carvajal (who had approved certain items in the past) did not have approval authority on behalf of Synergy; yet no other person with approval authority was identified. (1RR92:8-22.) As a result, Mr. Guzman followed up after the meeting by sending another e-mail to Mr. Welch, asking "[w]ho

will be the main POC for validations of the Design Changes for the A330s." (PX030; 1RR92:23 to 93:7.) Again, Mr. Guzman did not receive a response. (1RR93:8-9; 2RR26:18-24.)

63. Mr. Guzman then sent another e-mail on September 8, 2016, "following up" and asking Synergy to identify a point of contact regarding resolution of the issues listed in the Commitment Letters. (PX031; 1RR93:10-14.) Mr. Guzman explained that he had no charge purchase orders from Avianca airlines for modkits to address Commitment Letter items on the Boeing 787 aircraft, but Mr. Guzman needed both Synergy's approval as well as no charge purchase orders from Synergy to address the same issues on the A-330 aircraft. (*Id.*; 1RR15 to 94:10.) Mr. Guzman's e-mail communicated to Synergy that Zodiac was ready to move forward with resolving Commitment Letter items, but, again, Synergy did not respond to Mr. Guzman's e-mail. (1RR94:11-20; 2RR26:18-24; see Carvajal Depo. 33:21 to 34:11.)

64. In addition to his e-mails to Mr. Welch, Mr. Guzman sent e-mails to others as well in an effort to address the Commitment Letter items. (*E.g.*, PX084; 1RR84:21 to 85:17.) Mr. Guzman did not receive a response to these other communications either, which prevented Zodiac from moving forward with implementing changes to resolve the remaining Commitment Letter items. (1RR95:18 to 96:3.)

65. Synergy's CEO German Efromovich testified at his deposition in December 2018 that Synergy would certainly be willing to designate a point of contact promptly so that Zodiac could resolve the remaining Commitment Letter items, but Synergy never identified any point of contact after Mr. Efromovich's deposition. (Efromovich Depo. 153:8-14; *see* 2RR27:8-19.)

66. As recently as July 15, 2019, Mr. Guzman was still sending e-mails to Synergy, reiterating that Zodiac "remains fully committed to" closing out the Commitment Letters and

asking for "the green light to incorporate all pending and agreed design changes that address the concerns expressed by Synergy." (PX201; 1RR96:4-15.)

67. Importantly, Synergy responded to this e-mail about six weeks later and informed Zodiac for the first time that Synergy was no longer interested in getting the Commitment Letter items resolved because the A-330 aircraft are no longer affiliated with Synergy in any way. (1RR96:16-21.)

68. Synergy sold all six of the aircraft that were part of the A-330 Program. (2RR20:8 to 22:5.) Synergy sold (and leased back) the first two aircraft (i.e., MSNs 1492 and 1508) to Avalon and Aircastle immediately after taking delivery of the aircraft, and neither Avalon nor Aircastle is affiliated with Synergy. (2RR20:19-15.) Synergy sold the next two aircraft (i.e., MSNs 1540 and 1586) back to Airbus before the aircraft were put into commercial operation. (2RR20:15-18.) And Synergy sold the remaining two aircraft (i.e., MSN 1608 and 1657) in late 2018 or early 2019. (2RR21:1-25.) Synergy never notified Zodiac about its sales of MSN 1608 and 1657 until Mr. Welch sent the e-mail to Mr. Guzman in late 2019, at which time Synergy notified Zodiac for the first time that it no longer had any interest in having the Commitment Letter items resolved. (PX201; 2RR22:1-5.)

69. The shipsets Zodiac provided were installed on the A-330 aircraft that Synergy sold to others, and Synergy did not assume any responsibility to resolve any issues with the shipsets as part of its sale of the aircraft. (2RR22:6-19; 2RR23:8 to 24:3.) In addition, there was no evidence provided that the price Synergy received for the aircraft was reduced in any way by the condition of the seats in each aircraft. (2RR22:25 to 23:5.)

# CONCLUSIONS OF LAW

1.    The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds $75,000.00.  In particular, neither party is a citizen of the same state because Zodiac is a citizen of Delaware and Synergy is a citizen of Panama and Brazil.  Moreover, the amount in controversy exceeds $75,000.00 because Zodiac's Original Petition asserted damages from breach of contract and unjust enrichment "in excess of $1 million."  (Dkt. #1-1, p.16.)  The Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1331.[6]

2.    Venue for this action is proper in this Court under 28 U.S.C. § 1391(b)(2).

3.    The CISG governs the parties' claims (Dkt. #80).  "In comparison to the Uniform Commercial Code, the CISG allows for less formality in the establishment and modification of contracts."  *Laktapol Int'l v. Bassett & Walker Int'l, Inc.*, No. EP-12-CA-16-FM, 2013 WL 12130452, at *4 (W.D. Tex. Jan 10, 2013).

4.    Under the CISG, "[a] contract of sale need not be concluded in or evidenced by a writing and is not subject to any other requirement as to form."  CISG art. 11.  A proposal constitutes an offer if it is sufficiently definite to "indicate[] the goods and expressly or implicitly fix[] or make[] provision for determining the quantity and the price," and it shows an intention by the offeror to be bound if accepted.  *Chateau des Charmes Wines Ltd. V. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003) (quoting CISG art. 14).  An offer is accepted if the offeree makes a

---

[6] The parties did not invoke federal question jurisdiction as the basis for removal in the Notice of Removal (Dkt. #1).  Nor did they do so in the Joint Final Pretrial Order (Dkt. #57).  However, the parties did do so in their respective proposed findings of fact and conclusions of law (Dkts. #102; 103), and the Court is of the opinion that it has federal question jurisdiction over this matter.  Specifically, the Court has federal question jurisdiction under 28 U.S.C. § 1331 because the CISG, a treaty of the United States, governs the dispute in this case.  *See* 28 U.S.C. § 1331; *see also* (Dkt. #80).  And "[t]he CISG, ratified by the Senate in 1986, creates a private right of action in federal court."  *BP Oil Int'l, Ltd. V. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003) (citing *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024, 1027–28 (2d Cir.1995)).

"statement . . . or other conduct . . . indicating assent to an offer." *Id.* (quoting CISG art. 18). A contract is concluded "at the moment when an acceptance of an offer becomes effective." *Id.* (quoting CISG art. 23).

5. The CISG allows for a contract to be "modified or terminated by the mere agreement of the parties." *Id.* (quoting CISG art. 29); *see New World Trading Co. Ltd. V. 2 Feet Productions, Inc.*, 2014 WL 2039138, at *7 n.140 (S.D.N.Y. May 16, 2014), *aff'd in part, remanded in part on other grounds*, 652 F. App'x 65 (2d Cir. 2016) ("Under the CISG, a contract modification may be reached by the mere agreement of the parties without additional consideration."). Further, "parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned." *Citgo Petroleum Corp. v. Odfjell Seachem*, No. CIV.A. H-07-2950, 2013 WL 2289951, at *5 (S.D. Tex. May 23, 2013) (quoting CISG art. 9(2)).

6. The CISG does not distinguish breach of contract actions from breach of warranty actions, as does Texas contract law. But it does contain provisions regarding conformity of the goods with the contract. Specifically, Article 35 provides that the goods contracted for and delivered must be "of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." CISG art. 35(1). Further, absent an agreement otherwise, the goods are considered nonconforming unless they:

> *(a)* are fit for the purposes for which goods of the same description would ordinarily be used; *(b)* are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract, except where the circumstances show that the buyer did not rely, or that it was unreasonable for him to rely, on the seller's still and judgment; *(c)* possess the qualities of goods which the seller has held out to the buyer as a sample or model[.]

*Id.*

7.      Zodiac and Synergy formed a contract, governed by the CISG, for Zodiac to manufacture and deliver shipsets of tourist class and business class seats for the A-330 Program. Synergy made an offer to buy the shipsets and related services from Zodiac by issuing a series of purchase orders signed by an authorized representative of Synergy. Zodiac accepted Synergy's purchase orders under agreed terms and conditions and provided Synergy with purchase order acknowledgements that were signed by authorized representatives of Zodiac. Together, the purchase orders, purchase order acknowledgements, agreed terms and conditions, and invoices evidence the essential terms of the parties' initial agreement, and this agreement was supported by consideration in that Zodiac would manufacture and deliver the shipsets in exchange for payment. Accordingly, a valid and enforceable contract was formed. *See* CISG art. 11, 14, 18, 23; *cf. Mat-Wah Int'l Enter., Ltd. V. Enmon Accessories, LLC*, 2013 WL 12120263, at *3 (E.D. Tex. Mar. 11, 2013).

***Amounts in Dispute***

8.      Before making further conclusions of law regarding the merits of the parties' contract dispute, the Court finds it helpful to restate the amounts in dispute between the parties.

9.      It is undisputed that the total amount sought by Zodiac is $5,056,049.46. That figure breaks down as follows: (i) $2,200,406.50 for total unpaid non-recurring expenses; (ii) $2,800,472.96 for unpaid amounts due on Shipsets 1 and 2; and (iii) $55,170.00 in freight charges.

10.      Then, from the total outstanding balance of $5,056,049.46, Zodiac and Synergy agreed to a deduction of $1,462,350.00 pursuant to the Delay Agreement. (*Id.*, Joint Stip. ¶62.) The deduction of $1,462,350.00 under the Delay Agreement is equal to the delay-related charges imposed by Airbus on Synergy for Shipsets 1 and 2. (*See e.g.*, PX054.) The amount still in dispute

between the parties is thus $3,593,699.46. (Dkt. #57, Joint Stip. ¶63.) Zodiac's position is that Synergy owes it the full $3,593,699.46.

11.     From this $3,593,699.46 figure, however, Synergy seeks various deductions. First, it argues that it should be able to deduct $1,835,104.00 in delay-related charges charged to it by Airbus for late delivery of Shipsets 3–6. This would leave $1,758,595.46 owed to Zodiac. Whether Synergy is entitled to withhold $1,835,104.00 in delay-related charges charged to it by Airbus for late delivery of Shipsets 3–6 will depend on whether the late delivery of Shipsets 3–6 to Airbus was Synergy's fault or Zodiac's fault.

12.     Second, Synergy argues that it should be able to further deduct $1,100,203.25— 50% of outstanding non-recurring expenses—related to certain unresolved items from the Commitment Letters pursuant to the Non-recurring Expenses Agreement. This would leave $658,392.21 owed to Zodiac. Whether Synergy is entitled to withhold $1,100,203.25 from the total amount sought by Zodiac will depend on whether Zodiac completed all the outstanding Commitment Letter items pursuant to the Non-recurring Expenses Agreement. (*See* PX016.)[7]

13.     The remaining $658,392.21 figure *includes* the $55,170.00 in freight charges incurred by Zodiac that Zodiac seeks to recover. Whether Synergy is entitled to withhold that $55,170.00 will depend on the specific terms of the parties' agreement. (*See* PX200; PX042, Item #7; PX043, Item #3.)

14.     And Synergy does not argue directly that it does not owe Zodiac the $55,170.00 in freight charges. Rather, Synergy argues simply that because Shipsets 1 and 2 were late and because

---

[7] The Court notes that Zodiac also never received the *other* 50% of its non-recurring expenses. Under the Non-recurring Expenses Agreement, Zodiac was promised 25% of its remaining non-recurring expenses upon delivery of the fifth aircraft and 25% of its remaining non-recurring expenses upon delivery of the sixth aircraft. That $1,100,203.25 is part of the total $2,200,406.50 Zodiac seeks to recover in non-recurring expenses, but it is distinguishable from *this* $1,100,203.25, which Zodiac seeks to recover upon completion of all the Commitment Letter items.

they contained certain quality issues, it is entitled to further deductions exceeding the remaining outstanding amount of $658,392.21. That is, Synergy estimates that the penalties owed it due to Zodiac's late delivery of Shipsets 1 and 2, plus the costs associated with fixing the quality issues with the seats, would exceed $658,392.21. Thus, Synergy's position is that, after accounting for the deductions that it is owed, Zodiac is not entitled to any of the $3,593,699.46 sought.

***Shipsets 1 and 2***

15.     Early in Zodiac's performance of the contract, Synergy identified issues with Shipsets 1 and 2 that it deemed unsatisfactory and nonconforming, including certain issues with both form and function. Zodiac documented the problems in Commitment Letters and made an offer to Synergy to resolve the identified issues through the provision of no-charge replacement parts, modification kits, or other measures after Airbus delivered the aircraft to Synergy. Synergy and Zodiac negotiated the terms of the Commitment Letters, and Synergy accepted Zodiac's offer—*despite the identified nonconformities*—that Zodiac should continue to manufacture and deliver the seats to Airbus with the understanding that the parties would work to resolve the issues Synergy found unsatisfactory after the aircraft were delivered to Synergy. (*See* PX059–60; CISG art. 11, 14, 18; *see also id.* art. 46(3) (recognizing a buyer's option to have the seller remedy a "lack of conformity by repair").)

16.     Parties contracting under the CISG are deemed to have made applicable to their contract an understanding that it is "widely known to, and regularly observed by, parties to contracts of the type involved" that an agreement to resolve unsatisfactory issues through Commitment Letters means that the buyer will make full and timely payment, and the seller will thereafter perform its obligations by coordinating with the buyer to implement appropriate fixes and modifications. (*See* CISG art. 9; 1RR45:2–8.)

17.    The Commitment Letters effectively modified the parties' original agreement.[8] Although Synergy suggested at trial that the Commitment Letters were not supported by independent consideration, contract modifications need not be supported by independent consideration to be valid under the CISG. *See New World Trading Co.*, 2014 WL 2039138, at *7 n.140. The Commitment Letters reflected Synergy's agreement to accept and pay for the partially nonconforming seats and Zodiac's agreement to subsequently modify and fix all identified defects. This type of contract modification is acceptable and common in the industry, as pickup items and/or quality issues frequently arise. (*See* 1RR42:5-7; 1RR44:16-21; 2RR24:12-15.)

18.    Synergy was under no obligation to accept the terms in the Commitment Letters for the pickup items with the seats. It had other remedies under the CISG. For example, for nonconforming goods, Synergy could instead have required Zodiac to deliver substitute goods, to the extent that it could show "the [goods'] lack of conformity constitute[ed] a fundamental breach of contract and a request for substitute goods is made . . . within a reasonable time." *See* CISG 46(2). It did not do so. Instead, Synergy elected to accept the terms set out in the Commitment Letters, under which it accepted the partially nonconforming goods and required Zodiac to repair them in exchange for payment of those goods. *See* CISG 46(3) ("If the goods do not conform with the contract, the buyer may require the seller to remedy the lack of conformity by repair, unless this is unreasonable having regard to all the circumstances.").

19.    Thus, Synergy exercised its right under the CISG to require Zodiac to repair the defects in the seats. Importantly, this remedy did not affect Synergy's general obligation to furnish timely payment for the seats. Indeed, there is no CISG provision entitling a buyer to withhold the

---

[8] The Commitment Letters were not part of the original basis of the parties' bargain for the A-330 Program; rather, the Commitment Letters represented a subsequent agreement between the parties concerning certain unsatisfactory aspects of the seats that were contracted for in the original agreement. (1RR44:16-21; 1RR45:2-8; 1RR48:11-15.)

full contract price due to receipt of partially nonconforming goods. And industry custom, which is impliedly incorporated into the parties' agreements, directs a buyer to render the contract price upon receipt of goods—even goods with pickup items.

20.     Thus, Synergy was not entitled to withhold the entire contract price for Shipsets 1 and 2 due to the presence of pickup items. Because Synergy failed to fulfill its payment obligations for Shipsets 1 and 2, Synergy therefore breached the parties' modified agreement. Synergy's breach was fundamental, in that "it result[ed] in such detriment to [Zodiac] as substantially to deprive [Zodiac] of what [it] is entitled to expect under the contract"—namely, timely payment for manufacture and delivery of Shipsets 1 and 2. *See* CISG art. 25.

21.     Neither was Synergy entitled to withhold payment to Zodiac because of the initial delay in delivery of Shipsets 1 and 2.

22.     It is undisputed that delivery of Shipsets 1 and 2 was delayed. But the parties' agreement contained a specific provision related to how they would resolve late delivery of shipsets. Specifically, under the terms of the parties' agreement, after a 5-day grace period, Zodiac was obligated to pay Synergy a penalty equaling one percent (1%) of the value of the shipset per day, up to twenty percent (20%), until delivery is made. (PX042, p.4; PX043, p.4.) This delay penalty provision, however, did not entitle Synergy to fully withhold payment from Zodiac. Rather, the Court interprets the parties' agreement to provide that Synergy's remedy under the agreement is to charge Zodiac the penalty owed after paying the price for the shipsets. Zodiac's obligation to tender the appropriate delay penalty to Synergy is a separate obligation entirely from Synergy's obligation to pay the contract price and did not excuse Synergy's obligation to do so.

23.     Because neither the quality defects nor the initial delay in delivery of Shipsets 1 and 2 excused Synergy's obligation to timely fulfill its payment obligations, Synergy breached the parties' agreement.  This breach caused Zodiac damages.

24.     Following Synergy's initial failure to timely render full payment to Zodiac for Shipsets 1 and 2, Zodiac placed a credit hold on Synergy's account while Zodiac sought assurances from Synergy that it would fulfill its payment obligations for the A-330 Program.  With respect to the credit hold, it is widely known to, and regularly observed by, parties to contracts in the international airline industry that a vendor such as Zodiac may place a credit hold on a customer's account due to delinquency in payment and stop providing goods or services until the delinquency is resolved.  *E.g.*, 2RR29:1-13; *see Citgo*, 2013 WL 2289951, at *5 (quoting CISG art. 9(2)).  It is further known and observed in the industry that a credit hold may result in production delays.  *E.g.*, 1RR58:3-7; 2RR29:14-21.

25.     And production delays did indeed occur.  The first credit hold, which was placed on Synergy's account on May 7, 2014 and kept in place until February 2015, delayed significantly the manufacture and delivery of Shipsets 3–6.  This resulted in Airbus imposing delay-related penalties on Synergy for late delivery of buyer furnished equipment.  Contrary to Synergy's assertion, it did not establish that these penalties were Zodiac's fault or a result of any breach on Zodiac's part.  Rather, it was Synergy's failure to render payment for Shipsets 1 and 2—Synergy's breach—that caused Zodiac to place the initial credit hold on Synergy's account.  The ensuing delay-related charges imposed on Synergy by Airbus—amounting to $1,835,104.00—are thus Synergy's responsibility, not Zodiac's.  Synergy is thus not entitled to withhold $1,835,104.00 from the total amounts sought by Zodiac.  The dispute as to that amount is between Synergy and

Airbus; Synergy cannot "pass that on" to Zodiac in the form of a deduction from the total amounts owed.

*Outstanding Non-Recurring Expenses*

26.     Pursuant to the Non-recurring Expenses Agreement, Zodiac was entitled to recover from Synergy fifty percent (50%) of its outstanding non-recurring expenses following Zodiac's full resolution of the outstanding Commitment Letter items. The amount of total outstanding non-recurring expenses equals $2,200,406.50. Thus, fifty percent (50%) of $2,200,406.50 that Zodiac seeks to recover from Synergy for completing the remaining Commitment Letter items equals $1,100,203.25.

27.     Before Zodiac could address the pickup items as reflected in the Commitment Letters, however, Zodiac needed to coordinate with Synergy and, among other things, communicate with a point of contact about the pickup items and receive signed no charge purchase orders from Synergy. Not only was Synergy completely nonresponsive to Zodiac's attempts to identify a point of contact within Synergy to discuss resolution of the pickup items, but Zodiac never received no charge purchase orders from Synergy for many of those items.

28.     Synergy's failure to communicate with Zodiac and provide signed no charge purchase orders was thus responsible for Zodiac's inability to fully address the outstanding Commitment Letter items. Indeed, this is the reason that some Commitment Letter items for the A-330 Program never got resolved.

29.     Moreover, by mid to late 2019, Synergy expressed that it was no longer interested in getting the Commitment Letter items resolved because the A-330 aircraft are no longer affiliated with Synergy in any way. (1RR96:16-21.) The Court concludes that this, combined with

Synergy's failure to communicate or cooperate with Zodiac to get the pickup items resolved, discharged Zodiac's responsibility to address those items.

30.     This did not, however, discharge Synergy's responsibility to pay Zodiac the non-recurring expenses it had already incurred with respect to Shipsets 1 and 2.  Synergy cannot, with impunity, simply refuse to communicate with Zodiac and then tell Zodiac it no longer seeks Zodiac's performance.  The Court suspects that Synergy concluded that paying Zodiac's non-recurring expenses was less economical than absorbing the costs of the pickup items itself, and upon reaching this conclusion, sought to avoid fulfilling its contractual obligations.  But Synergy may not do so.  Despite expressing to Zodiac that Zodiac need not address the outstanding pickup items, Synergy is nevertheless responsible for upholding its end of the agreement.  Thus, Synergy is not entitled to withhold $1,100,203.25 from the amounts sought by Zodiac.

### *Freight Charges*

31.     It is undisputed that Zodiac incurred $55,170.00 in freight charges.

32.     Under the parties' agreement, Synergy is responsible for paying freight charges unless the parties agreed otherwise.  There is no evidence the parties agreed otherwise, yet Zodiac has not been paid for freight charges it incurred in delivering the shipsets for the A-330 Program.  (*E.g.*, 1RR28:13-21; 1RR30:5-14; 1RR35:20 to 36:36; 2RR37:7-10.)  This is a breach of the parties' agreement by Synergy, and it has caused damages to Zodiac.

33.     Therefore, Synergy is not entitled to withhold $55,170.00 in freight charges from the total amounts sought by Zodiac.

***Amounts Owed Before Delay Penalty or Quality Defect Reduction***

34.     On balance then, as to the $3,593,699.46 in dispute, Synergy is not entitled to deduct $1,835,104 in delay-related charges imposed by Airbus, nor is it entitled to deduct $1,100,203.25 in non-recurring expenses or $55,170.00 in freight charges.

***Delay Penalty***

35.     Notwithstanding Synergy's initial breach, the Court recognizes that Synergy did not receive the full benefit of its bargain.  Namely, it did not timely receive fully conforming seats for all the shipsets it ordered.  Thus, Synergy has a remedy under the CISG.

36.     First, though Zodiac and Synergy executed the Delay Agreement, resolving the delay-related charges imposed by Airbus on Synergy for Shipsets 1 and 2, the fact remains that Synergy and Zodiac had a separate agreement between themselves concerning Synergy's remedy for untimely delivery by Zodiac.

37.     Shipset 1 and Shipset 2 were delivered late.  In fact, it is undisputed that Shipsets 1 and 2 were delivered more than 25 days late.  (*See* Joint Stip., pg. 27–28.)  Although this did not entitle Synergy to withhold payment for those shipsets, as discussed *supra*, it does entitle Synergy to recover a delay penalty pursuant to its agreement with Zodiac.

38.     Specifically, the parties' agreement provided that if timely delivery of the shipsets was not made, Zodiac would pay, after a 5-day grace period, a late delivery penalty equal to one percent (1.0%) of any given shipset value per day (up to a max of twenty percent (20%)).  (*See* PX042, p. 4, PX043, p. 4).

39.     Because Shipsets 1 and 2 were delivered more than 25 days late, Zodiac is obligated to pay Synergy a delay penalty of twenty percent (20%) of the value of Shipset 1 and of Shipset 2. Shipset 1 was invoiced for $3,947,816.00, and Shipset 2 was invoiced for $3,947,816.00.  Twenty

percent (20%) of $3,947,816.00 equals $789,563.20.  Thus, Zodiac owes Synergy a delay penalty of $789,563.20 for Shipset 1 and a delay penalty of $789,563.20 for Shipset 2.  This comes out to a total delay penalty of $1,579,126.40 owed by Zodiac to Synergy for Shipsets 1 and 2.

***Quality Defect Reduction***

40.     The second issue that remains concerns whether, under the CISG, Synergy is entitled to a reduction of the contract price for the quality issues with the seats, which are reflected in the Commitment Letters issued by Zodiac to Synergy.

41.     Under Article 50 of the CISG, a buyer who receives nonconforming goods is entitled to reduce the full contract price for the goods ordered in the same proportion as the value of the goods received.  In particular, Article 50 of the CISG provides:

> If the goods do not conform with the contract and whether or not the price has already been paid, the buyer may reduce the price in the same proportion as the value that the goods actually delivered had at the time of the delivery bears to the value that conforming goods would have had at that time.

CISG art. 50.

42.     Thus, under Article 50 of the CISG, Synergy is entitled to a reduction in price of Shipsets 1 and 2 in a proportion equal to the diminished value of the seats as received.  Though the evidence indicates that some quality issues got repaired, other quality issues were never repaired.  Thus, the seats are still partially nonconforming, as Zodiac has not repaired them to conform fully to Synergy's expectations under the contract.  However, Synergy did not present evidence at trial sufficient for the Court to determine the reasonable value of the goods received in comparison to the contract price.

43.     To be sure, Synergy stated in its proposed order that "Zodiac was estimating it would still cost between $700,000 and $900,000 to actually implement solutions that would result in seats that comported with Synergy's expectations under the Parties' agreement" and that this

amount reasonably reflects the reduction in value of the Shipsets actually delivered by Zodiac. But Synergy failed to provide any evidence at trial to support this estimate.

44.     When asked during trial whether anyone at Synergy had attempted to quantify how much it would cost Synergy to address the remaining Commitment Letter items, Mr. Welch testified that doing so would be a "pointless exercise." (2RR25:16–23.) And when asked whether Synergy had any evidence to show that the revenue generated from ticket sales on A-330 aircraft containing seats with pickup items was less than it would have been had the seats not had pickup items, Mr. Welch responded that Synergy had no such evidence. (2RR100:19–25.)

45.     Without more evidence from Synergy as to how much the value of the Shipsets diminished as a result of the outstanding quality issues, the Court cannot conclude that Synergy carried its burden of showing the amount of a reduction it is entitled to. Accordingly, though the CISG entitles Synergy to a reasonable reduction of the contract price for the diminished value of the goods, the Court declines to award it the same because it failed to carry its burden of demonstrating the appropriate reduction amount.

***Final Calculation of Amounts Owed***

46.     In sum, Zodiac seeks to recover $3,593,699.46 from Synergy. From this, Synergy seeks to deduct (i) $1,835,104.00 in delay-related penalties charged to it by Airbus for late delivery of Shipsets 3–6; and (ii) $1,100,203.25 in non-recurring expenses because Zodiac did not resolve the remaining Commitment Letter items. Synergy is not entitled to either of the above deductions. Neither is Synergy entitled to withhold the $55,170.00 in freight charges incurred by Zodiac. Therefore, Synergy owes Zodiac the full $3,593,699.46.

47.     However, Zodiac owes Synergy $1,579,126.40 because of the late delivery of Shipsets 1 and 2.

*Attorneys' Fees*

48.     Finally, as described in further detail in the Magistrate Judge's Memorandum Opinion and Order dated April 23, 2019, the CISG does not bar the prevailing party's ability to recover attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code. (Dkt. #80).

49.     The Texas Civil Practice and Remedies Code provides that a prevailing party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001(8).

50.     The Texas Supreme Court has explained generally that a prevailing party is one that has "prove[ed] compensable injury and secure[d] an enforceable judgment in the form of damages." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). That is, one that "obtain[ed] actual and meaningful relief, something that materially alters the parties' legal relationship." *Id.* If a party can show it is a "prevailing party" in a breach of contract dispute, then under the Texas Civil Practice and Remedies Code, it is entitled to recover its reasonable attorneys' fees, as well as costs and pre- and post-judgment interest.

51.     Neither party fully briefed the Court on the question of entitlement to attorneys' fees. Accordingly, the Court will reserve ruling on entitlement to attorneys' fees, and the respective amount(s) of fees, until further briefing by the parties.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Synergy is liable to Zodiac in the amount of $3,593,699.46.

It is further **ORDERED** that Zodiac is liable to Synergy in the amount of $1,579,126.00.

It is further **ORDERED** that, pursuant to Federal Rule of Civil Procedure 54(d)(2)(A)– (B), the parties will submit briefing on the question of entitlement to and amount of attorneys' fees and other related nontaxable expenses no later than fourteen (14) days after the entry of judgment.

**SIGNED this 8th day of April, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE